# Preparation of Slip Laws from Hand-Enrolled Legislation

The National Archives and Records Administration may not make any editorial changes in the content of a statute, no matter how minor, including spelling or punctuation changes.

The National Archives and Records Administration may make changes in typeface and type style, and other such changes that do not alter the content of a statute.

November 29, 1989

MEMORANDUM OPINION FOR THE ARCHIVIST OF THE UNITED STATES

This memorandum is in response to the request of your office for our opinion concerning whether the National Archives and Records Administration ("NARA") may make editorial corrections, such as spelling or punctuation changes, in preparing hand-enrolled legislation for publication as a slip law. For the reasons set forth below, we conclude that: (1) NARA may not make any editorial changes in the content of a statute, no matter how minor, including spelling or punctuation changes; but (2) NARA may make changes in typeface and type style, and other such changes that do not alter the content of a statute.

Your office has also requested advice as to how it should prepare a slip law when portions of the hand-enrolled legislation are illegible or ambiguous. As explained more fully below, we conclude that NARA has no authority to reconstruct or interpret illegible statutory text. Accordingly, we believe that the best procedure would be for NARA: (1) to typeset all unambiguous portions of the law and (2) to photograph into the slip law any illegible portions.

## I. Background

After a bill has been passed by both Houses of Congress, it is "enrolled" for presentation to the President pursuant to Article I, Section 7, Clause 2 of the Constitution. Under the normal procedures, enrollment involves printing the final text of the bill, including any changes made by amendments, on parchment or other suitable paper. 1 U.S.C. §§ 106, 107. The enrollment of the bill is supervised by the Clerk of the House of Representatives or the Secretary of the Senate, depending upon the House in

which the bill originated. When the number of amendments is large, this process can be quite complicated inasmuch as each of the amendments "must be set out in the enrollment exactly as agreed to, and all punctuation must be in accord with the action taken." Edward F. Willett, Jr., Esq., Law Revision Counsel, U.S. House of Representatives, *How Our Laws Are Made*, H.R. Doc. No. 158, 99th Cong., 2d Sess. 43 (1985). In addition to assembling the text from the various amendments, the Clerk or Secretary, in enrolling a bill, proofreads the text for spelling errors and other technical mistakes. Serious technical errors that are discovered are often corrected by means of a concurrent resolution ordering the Clerk or the Secretary to make the corrections to the enrolled bill. Charles Tiefer, *Congressional Practice and Procedure: A Reference, Research, and Legislative Guide* 249 (1989); *see, e.g.*, S. Con. Res. 79, 99th Cong., 1st Sess., 99 Stat. 1962 (1985); H.R. Con. Res. 340, 98th Cong., 2d Sess., 98 Stat. 3480 (1984); S. Con. Res. 154, 98th Cong., 2d Sess., 98 Stat. 3518 (1984). The Clerk or Secretary, however, will generally correct very minor errors, such as obvious spelling mistakes, without the passage of a concurrent resolution.

Once the bill has been enrolled, it is sent to the appropriate congressional authorities for approval. In the House, enrolled bills are first sent to the Committee on House Administration. H.R. Doc. No. 158 at 43. If the Committee finds the printing to be accurate, the Chairman attaches a note to this effect and forwards the bill to the Speaker for signature. *Id.* In the Senate, the Secretary of the Senate examines the printed bill for accuracy before forwarding it for signature to the President of the Senate or the President pro tempore. Robert U. Goehlert & Fenton S. Martin, *Congress and Law-Making: Researching the Legislative Process* 38 (2d ed. 1989). After the enrolled bill has been signed by both the Speaker of the House and the President of the Senate, it is then presented to the President. If the bill is approved by the President, an exact photoprint of the enrolled bill is sent to NARA,[1] which then forwards the bill to the Public Printer for preparation of the slip law. 1 U.S.C. § 106a; 44 U.S.C. § 710. The Public Printer ("GPO") is required to print an "accurate" preliminary copy of the law, which is then sent to NARA "for revision." 44 U.S.C. § 711. NARA has interpreted this latter provision as allowing it only to correct errors made by GPO in printing the preliminary copy; NARA does not make editorial changes to the text as received from the President. After making any corrections that are necessary to ensure that the text conforms to that of the original bill signed by the President, NARA adds notations giving the public or private law number, legal citations, and other such ancillary information, and then returns the preliminary copy to GPO, which inserts these corrections and then prints the required

---

[1] By regulation, NARA has delegated its responsibilities for preparing slip laws to the Office of the Federal Register, which is a component of NARA. 1 C F R §§ 2.3(a), 2 5(b) (1989).

number of slip laws. 44 U.S.C. §§ 709, 711. These slip laws are "competent evidence" of the Acts of Congress "without any further proof or authentication thereof." 1 U.S.C. § 113.

The issues addressed in this memorandum arise from Congress' occasional departure from the normal process of preparing printed enrollments of bills before presenting them to the President. Until recently the printing requirement was waived only rarely. Congress waived the requirement at the end of the second session of the 54th Congress, see 29 Stat. app. 17 (1897), and again at the end of the second session of the 70th Congress, see H.R. Con. Res. 59, 70th Cong., 2d Sess., 45 Stat. 2398 (1929). Thereafter, Congress does not appear to have dispensed with a printed enrollment until 1982. See H.R. Con. Res. 436, 97th Cong., 2d Sess., 96 Stat. 2678 (1982). In the 1982 case, Congress passed a concurrent resolution waiving the printing requirement for certain bills for the remainder of the session and authorizing the enrollment of the bills in "such form as may be certified by the Committee on House Administration to be a truly enrolled joint resolution." Id. A similar waiver was authorized by concurrent resolution in 1984. See H.R. Con. Res. 375, 98th Cong., 2d Sess., 98 Stat. 3519 (1984). In recent years, Congress has tended simply to pass a new statute specifically designed to waive the normal enrollment requirements for particular statutes or for specified periods of time. See, e.g., Pub. L. No. 99-463, 100 Stat. 1184 (1986); Pub. L. No. 99-188, 99 Stat. 1183 (1985).

The waiver of the normal requirement of preparing a printed enrollment of a bill before it is presented to the President has produced a number of problems in connection with the preparation of slip laws. The hand-enrolled bills are often hastily put together, include a number of mistakes, and contain handwritten portions that may be unclear or illegible. Under the ordinary procedures, these errors generally would have been caught and corrected, either by concurrent resolution or in the enrollment process, before the bill was presented to the President. With the hand enrollments, however, bills cannot be proofread until after they have already been approved by the President. Although the enrollment waivers made during the 1982, 1984, and 1985 sessions did not expressly provide for post-enactment enrollment, the House Enrolling Clerk did in fact supervise the typesetting of the hand-enrolled bills after enactment, using the same standards, including corrections of misspellings and other nonsubstantive errors, that are used during the normal pre-enactment enrolling process. At the time, NARA was unaware that these changes were being made, and the typeset copies of the enrolled bills, which included such changes, were processed into slip laws.

In the spring of 1986, it came to NARA's attention that the House Enrolling Clerk had been making minor editorial changes in the process of supervising the typesetting of hand-enrolled legislation. Later that year, when NARA received a typeset copy of Pub. L. No. 99-509, 100 Stat. 1874 (1986), and noted that it contained such changes, NARA requested

that the House Enrolling Clerk remove the "corrections" that had been made. The Clerk agreed to do so. On a subsequent occasion, however, the House Enrolling Clerk refused to remove the corrections, and NARA itself had the relevant portions typeset so as to conform to the hand-enrolled bill that had been presented to the President. See Pub. L. No. 99-570, 100 Stat. 3207 (1986).

On subsequent occasions when the printing requirements were waived, Congress attempted to mitigate the problems associated with hand enrollment by expressly providing that, subsequent to approval by the President, a printed enrollment of the bill would be prepared, signed by the presiding officers of both Houses, and transmitted to the President for his "certification" that the printed enrollment was a correct printing of the hand enrollment. See, e.g., Pub. L. No. 100-454, § 2, 102 Stat. 1914, 1914-15 (1988); Pub. L. No. 100-203, § 8004, 101 Stat. 1330, 1330-282 to 1330-238 (1987); Pub. L. No. 100-202, § 101(n), 101 Stat. 1329, 1329-432 to 1329-433 (1987). In the process of preparing a printed enrollment, the House Enrolling Clerk was specifically authorized to make "corrections in spelling, punctuation, indentation, type face, and type size and other necessary stylistic corrections to the hand enrollment." See, e.g., Pub. L. No. 100-454, § 2(a)(2), 102 Stat. 1914 (1988). In the case of each such statute, the President authorized NARA to make the determination as to whether the printed enrollments were "correct printings of the hand enrollments." See 53 Fed. Reg. 50,373 (1988); 53 Fed. Reg. 2816 (1988). Finally, these Acts each specifically provided that, after certification, the printed enrollment was to be used instead of the hand enrollment in order to prepare the slip law, and that the printed enrollment was to be considered for all purposes as the original enrollment.

NARA has sought our advice concerning when and to what extent any technical changes may be made to the text of a bill that has already been enacted into law. NARA confronts this question in two different contexts: (1) whether changes can be made by NARA or the House Enrolling Clerk when there is no post-enactment certification procedure; and (2) when there is such a procedure, whether NARA should, pursuant to its delegated authority, certify as "correct" post-enactment enrollments that differ in certain respects from the hand enrollment. Finally, NARA seeks advice concerning how to prepare slip laws when portions of the hand-enrolled legislation are illegible.

## II. Discussion

A. *Printing procedures when Congress has waived normal enrollment requirements without providing for post-enactment enrollment*

When there is no statute authorizing a post-enactment certification procedure, we think that it is clear that no changes may be made to the

text of a hand-enrolled statute in the course of processing it into a slip law. The simple reason for this conclusion is that the statutory scheme regulating the printing of slip laws, as outlined above, does not allow for alterations of the text of new laws. By statute, NARA receives the originals, 1 U.S.C. § 106a, sends a copy to GPO, 44 U.S.C. § 710, and GPO is required to print an *"accurate"* preliminary copy of the law, 44 U.S.C. § 711 (emphasis added).

This preliminary copy is then further proofread by NARA, which sends the copy back to GPO with any corrections and with the appropriate ancillary information to be inserted in the margins.[2]

Furthermore, under the normal statutory scheme the House Enrolling Clerk has no role whatsoever in the printing of laws that have already been enacted. Pursuant to 1 U.S.C. § 106a, NARA receives the original copy of the statute, not from the House Enrolling Clerk, but either directly from the White House (if the bill was approved) or directly from the Speaker of the House or the President of the Senate (if the bill became law without the President's approval).[3] Accordingly, under the conventional scheme, there is no statutory authorization for a procedure whereby the House Enrolling Clerk supervises the typesetting of a bill that has already been enacted into law, makes editorial changes, and then forwards it to NARA for printing. Thus, in situations where Congress has merely waived the enrolling requirements of 1 U.S.C. §§ 106 & 107 without providing for a post-enactment enrollment procedure, NARA clearly should use only the original hand enrollments in the preparation of the slip laws.

---

[2] We agree with NARA that 44 U.S.C § 711. which states that the preliminary copy is to be sent to NARA "for revision," does not authorize NARA to make editorial changes to the text of the original copy of the statute, rather, NARA corrects only errors made by GPO in the course of printing the preliminary copy. The phrase "for revision" originated in the Act of Mar. 9, 1868, ch. 22, § 2, 15 Stat. 40, the relevant portion of which was subsequently codified, as amended, in 44 U S C § 711 The 1868 Act provided that, rather than receiving copies of all new laws from the Secretary of the Senate (which was the prior practice, *see* Act of June 25, 1864, ch 155, § 7, 13 Stat 184, 185-86), the congressional printer would receive a "correct copy" directly from the Secretary of State (who was at that time charged with preserving the originals), and the printer would then prepare an accurate preliminary copy to be sent to the Secretary of State "for revision." The author of the 1868 Act, Senator Anthony, made clear that this procedure was designed to ensure that the printed slip laws would carefully match the originals

> [Slip laws] have been heretofore furnished by the Secretary of the Senate and the Clerk of the House of Representatives. This bill provides that they shall be furnished hereafter from the rolls of the State Department, *so that they may be perfectly authentic and correct* There have been some errors heretofore, necessarily, in furnishing the laws without taking them from the rolls.

Cong Globe, 40th Cong , 2d Sess 1126 (1868) (emphasis added) In light of this emphasis on authenticity and faithfulness to the original copy, we believe that the "for revision" language of section 711 should be construed only as permitting NARA to correct errors made by GPO in the course of preparing the preliminary copy.

[3] We recognize that, under long-accepted procedures, the photoprints for the slip law are generally made directly from the enrolled bill before it is sent to the President. This is a statutorily acceptable procedure only because the photoprints of the enrolled bill are in all respects identical to the copy presented to the President and subsequently delivered to NARA under 1 U S.C § 106a

## B. *Printing procedures when Congress has provided for postenactment enrollment*

Under the post-enactment certification procedures that have been used to date, the task of making minor editorial corrections to the hand-enrolled statutes has been assigned to the Clerk of the House of Representatives. *See* Pub. L. No. 100-454, § 2(a), 102 Stat. 1914 (1988); Pub. L. No. 100-203, § 8004(a), 101 Stat. 1330, 1330-282 (1987); Pub. L. No. 100-202, § 101(n)(1) & (2), 101 Stat. 1329, 1329-432 (1987). Under these procedures, the subsequent printed enrollment is presented to the President, not for his plenary review, but merely for his "certification" that the subsequent enrollment is a correct printing.

We believe that this procedure fails to provide the plenary right of review afforded to the President by the Presentment Clause and thus that these post-enactment certification proceedings are constitutionally defective.[4] In *INS v. Chadha*, 462 U.S. 919, 952 (1983), the Supreme Court held that every legislative act of the Congress must be presented to the President pursuant to Article I, Section 7 of the Constitution. Because the House Enrolling Clerk's actions in making editorial emendations to a law that has already been enacted is a legislative act, it must be subject to the presentment requirement of the Constitution.

There can be no doubt that drafting and amending statutory language are quintessential legislative tasks. Although many minor changes to statutes may appear too insignificant to be of practical import, we discern no principled basis for concluding that "minor" revisions of the text of statutes should be classified as anything other than a legislative activity. To conclude otherwise would be to suggest, contrary to the plain teaching of *Chadha*, that "minor" changes in the wording of statutes could be made by Congress other than through the Article I procedures. *See Chadha*, 462 U.S. at 954 n.18 ("There is no provision [in the Constitution] allowing Congress to repeal or amend laws by other than legislative means pursuant to [a]rt. I.").

Indeed, in this regard, we believe it is significant that, although codification and revision of statutes is often expressly intended not to be of any substantive significance, *see, e.g.,* S. Rep. No. 1621, 90th Cong., 2d Sess.

---

[4] We believe that the issue of the constitutionality of this procedure is distinct from the question of whether a court would be willing to receive the evidence necessary to permit a challenge to a statute that had been altered in the course of being printed in accordance with this procedure. *Cf. Field v Clark*, 143 U S 649, 669-72 (1892) (noting that, although "[t]here is no authority in .. the secretary of state to receive and cause to be published, as a legislative act, any bill not passed by congress," a court would nonetheless not receive evidence questioning the authenticity of a statute that was enrolled, attested to, and deposited in the public archives); *see also* Hans A. Linde, *Due Process of Lawmaking*, 55 Neb. L Rev 197, 243 (1976) ("We do not assume that a law has been constitutionally made merely because a court will not set it aside ...") We express no view as to the latter question of whether a court would be willing to receive evidence concerning, and to adjudicate a challenge to, a statute that was altered in the course of being printed.

2-3 (1968), *reprinted in* 1968 U.S.C.C.A.N. 4438, 4439-40 (enactment into positive law of title 44 of U.S. Code not intended to make any substantive changes), such revised codifications have never been considered to be conclusive evidence of the law unless they have first been enacted into positive law by Congress. *See* Pub. L. No. 80-278, 61 Stat. 633 (1947) (unenacted titles of U.S. Code are only "prima facie" evidence of the law), *codified as amended at* 1 U.S.C. § 204 (1988);[5] *cf. United States v. Welden*, 377 U.S. 95, 99 n.4 (1964) ("[A] 'change of arrangement' [in a statute] made by a codifier without the approval of Congress ... should be given no weight.").[6] In short, we believe that even a "minor" act of Congress is still an act of Congress, and a minor amendment is still an amendment.[7]

Accordingly, any attempt to alter the content of a statute by means of a procedure that does not afford the President the full review provided by the Presentment Clause would be unconstitutional. Therefore, should NARA ever again be required to determine and certify whether a subsequent printed enrollment is a correct printing of a hand-enrolled law, it should refuse to issue the certification if any change has been made to the content of the statute.

We do not believe, however, that changes in typeface, type style or the like are appropriately considered legislative acts. There is an important difference between altering the content of a law — *i.e.* changing the actual words and punctuation that make up the statute — and merely printing the statute in a different type size from that used when it was presented to the President. The former may well affect the meaning of the statute, whereas the latter will not. The Constitution is concerned with the content and composition of legislation, not with the printing standards

---

[5] Because the unenacted codifications are only prima facie evidence of the law, they may not prevail over the authentic Statutes at Large in the event of a conflict between the two. *American Bank & Trust Co v. Dallas County*, 463 U.S 855, 864 n.8 (1983); *Stephan v United States*, 319 U.S. 423, 426 (1943).

[6] It appears that on only one brief occasion has Congress ever permitted a revised codification to serve as conclusive evidence of the law *See* Act of Mar 2, 1877, ch. 82, § 4, 19 Stat. 268, 269 (new edition of revised statutes would constitute "legal and conclusive evidence of the laws") In the following year, however, Congress amended this statute to omit the words "and conclusive" and to provide that the use of the new edition of the Revised Statutes "shall not preclude reference to, nor control, in case of any discrepancy, the effect of any original act as passed by Congress." Act of Mar. 9, 1878, ch 26, 20 Stat 27 At any rate, the new edition of the Revised Statutes did *not* involve any alterations of statutory language; the revision commissioner was given no authority to makes any changes to the text of the first edition of the Revised Statutes (which had been enacted into positive law), except as authorized by formal amendments. *See* Act of Mar 2, 1877, § 2, 19 Stat. 268, 268-69 (outlining powers and duties of commissioner), *see also* Rev. Stat. at v (2d ed. 1878) ("The commissioner was not clothed with power to change the substance or to alter the language of the existing edition of the Revised Statutes, nor could he correct any errors or supply any omissions therein except as authorized by the several statutes of amendment.")

[7] The conclusion that there is no such thing as a "de minimis" change to a statute's text is further supported by examining some of the "minor" changes that have been made to statutes under the post-certification procedures that have been used to date For example, in the course of typesetting and "correcting" Pub L. No. 100-203, § 4113(a)(1)(B), the enrolling clerk changed a section reference in the statute from "(F)" to "(E)". *See* 101 Stat 1330-151 & n.52 This was itself an error; shortly thereafter Congress by statute ordered that the "(E)" be changed back to an "(F)" *See* Pub. L No 100-360, § 411(a)(3)(B)(iii), 102 Stat 683, 768 (1988).

359

whereby that content is reproduced for public consumption.[8] Thus, NARA is at liberty to make appropriate changes in typeface or type style of a statute.

## C. Printing procedures where portions of the statute are illegible

NARA has also requested advice as to how slip laws should be prepared when portions of the hand-enrolled legislation are illegible. In light of the above discussion concerning the legal limitations on the modification or correction of statutory text, we do not believe that NARA possesses any authority to "interpret" illegible or ambiguous text. If a portion of the statute simply cannot be read, NARA has no power to reconstruct the provision in the way that strikes it as most sensible. Nor may NARA rely on the House Enrolling Clerk or congressional committees to interpret indecipherable language; such a practice could allow for congressional alteration of statutory text without following the Article I, Section 7 procedure. In short, while NARA may typeset any handwritten portions that are legible, it may not interpret and then typeset provisions that are indecipherable.

The only remaining question concerns how NARA should publish the illegible portions. In the past, NARA has simply inserted blanks and dropped a footnote indicating that the text was not legible. *See, e.g.*, Pub. L. No. 100-203, § 4051(a), 101 Stat. 1330, 1330-93 & n.32a (1987). On at least one such occasion, Congress clarified the matter by passing a statute that supplied the missing language. *See* Pub. L. No. 100-360, § 411(a)(3)(C), 102 Stat. 683, 768 (1988). In our view, however, the use of blanks does not best comply with NARA's statutory responsibilities. As noted earlier, the statutory procedure for printing emphasizes the publication of a slip law that is an "accurate" copy of the original. Where a portion of a new law cannot be typeset because it is illegible, we believe that the statutory requirements of accuracy and faithfulness to the original require that the illegible portion be photographed and reproduced on the slip law. Such a procedure would unquestionably produce a more accurate copy of the statute than would using blanks. Furthermore, such reproduction would provide an official or private party who might seek to rely on the statute at least some opportunity to attempt to interpret it. The current procedure of using blanks provides no such guidance.

## III. Conclusion

To summarize: In producing slip laws from hand-enrolled legislation, NARA should make no changes to the text of statutes, but it may make

---

[8] In this regard, we note that any printing instructions that may be contained in the margins of a hand-enrolled statute (such as, for example, "Insert highlighted material from next page here") do not constitute part of the statutory text

changes in typeface and type style. If a particular printing is to be examined by NARA in order to determine whether it should be certified as a correct copy of the original, NARA should decline to certify if the printing contains any modifications to the content of the original. If a particular hand-enrolled statute contains illegible material, NARA should typeset the legible portions and photograph the illegible portions in producing the slip law.

WILLIAM P. BARR
*Assistant Attorney General*
*Office of Legal Counsel*